**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 5, 2023

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Rafael Martinez*, S2 22 Cr. 251 (LJL)**

Dear Judge Liman:

The Government respectfully submits this letter in advance of the sentencing of Raphael Martinez ("Martinez" or the "defendant") in the above-referenced matter, currently scheduled for July 17, 2023, at 2:30 p.m. For the reasons explained below, the Stipulated Guidelines Sentence of 60 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

## I. Background

### A. Offense Conduct

1. Overview

Martinez was the Chief Executive Officer and primary owner of MBE Capital Partners LLC and affiliated companies (together, "MBE"). (PSR ¶ 15; Dkt. 1 ("Compl.") ¶ 9). Beginning in at least April 2020, Martinez engaged in a variety of fraudulent conduct relating to the Paycheck Protection Program ("PPP"), a forgivable loan program designed to provide emergency financial assistance to Americans who were suffering the economic effects of the COVID-19 pandemic, and administered by the U.S. Small Business Administration ("SBA"). (PSR ¶¶ 10-13, 15-19; Compl. ¶¶ 9-13, 15). Broadly viewed, Martinez engaged in two PPP-related schemes. First, Martinez, through MBE, fraudulently obtained a PPP loan of over $280,000 from the SBA by making false statements regarding, among other things, the number of people employed by MBE and MBE's payroll expenses (the "PPP Loan Scheme"). (PSR ¶ 16; Compl. ¶¶ 19-22). Second, Martinez, through MBE, submitted fraudulent documents and made false statements to the SBA, a life insurance company (the "Company"), and the Federal Reserve in an effort to become a non-bank PPP lender and to obtain more than $900 million in capital to issue PPP loans, resulting in the payment of more than $70 million in fees to MBE (the "PPP Lender Scheme"). (PSR ¶ 17-19; Compl. ¶¶ 24-34). Martinez used these fees to finance a variety of lavish personal expenditures, including the following purchases: a villa in the Dominican Republic for over $10 million; a $3.5 mansion located in New Jersey; membership in a chartered jet service; and several luxury vehicles. (PSR ¶ 19; Compl. ¶ 13).

2. Background on the PPP Program

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted on March 29, 2020, and was designed to provide emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic. (PSR ¶ 11; Compl. ¶ 15). One source of relief provided by the CARES Act—and supplemented by the passage of the Paycheck Protection Program and Health Care Enhancement Act—was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses through the PPP. (PSR ¶ 11; Compl. ¶ 15). The PPP ended on or about May 31, 2021. (PSR ¶ 11; Compl. ¶ 15).

The PPP allowed qualifying small businesses and other organizations to receive unsecured, SBA-guaranteed loans with a maturity of two years at an interest rate of one percent. (PSR ¶ 12; Compl. ¶ 16). While the PPP was overseen by the SBA, individual PPP loans were issued by commercial lenders approved by the SBA, who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were guaranteed by the SBA. (PSR ¶¶ 12-13; Compl. ¶ 16). Under the terms of the PPP, these loans were required to be put toward payroll costs, mortgage interest, rent, and/or utilities, among other specified expenses. (PSR ¶ 12; Compl. ¶ 16). The PPP allowed the interest and principal on these loans to be forgiven if businesses spent the proceeds on specified expenses within eight weeks of receipt and used at least 75% of the forgiven amount for payroll. (PSR ¶ 12; Compl. ¶ 16). Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees employed by the business and the average associated payroll costs. (PSR ¶ 12; Compl. ¶ 16). Businesses applying for a PPP loan were, as a result, required to provide documentation of their payroll in applying for PPP loans. (PSR ¶ 12; Compl. ¶ 16).

As described above, the SBA authorized non-bank lenders to issue PPP loans. In order to become approved as a non-bank PPP lender, lenders were required to attest that, among other things, they had been operating since at least February 15, 2019; they had formal compliance programs relating to auditing and compliance with applicable laws; and that they had originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12-month period over the prior 36 months. (PSR ¶ 13; Compl. ¶ 17). In addition, applicants were required to submit their most recent fiscal year-end audited financial statements. (PSR ¶ 13; Compl. ¶ 17).

On April 8, 2020, the Board of Governors of the Federal Reserve System authorized each of the regional Federal Reserve Banks to establish and operate the Payment Protection Program Liquidity Facility ("PPPLF"). (PSR ¶ 14; Compl. ¶ 18). Under the PPPLF, Reserve Banks extended non-recourse credit to SBA-approved lenders that were eligible to originate PPP loans, taking the PPP loans as collateral. The purpose of the PPPLF was to bolster the effectiveness of the PPP, provide liquidity to credit markets, help stabilize the financial system, and provide relief to small businesses affected by the COVID-19 crisis. (Compl. ¶ 18).

3. The PPP Loan Scheme

On or about April 5, 2020, Martinez applied on behalf of Republic Group, LLC, a/k/a Republic Group Parts, LLC ("Republic Group"), d/b/a MBE to an FDIC-insured financial institution ("Bank-1") for a PPP loan; Martinez supplemented that application with additional information on or about April 15, 2020. (PSR ¶ 16; Compl. ¶ 19). In connection with the loan application, Martinez represented that MBE had as many as 15 employees and an average monthly payroll of approximately $119,390 in 2019. (PSR ¶ 16; Compl. ¶¶ 10, 19). In order to support those representations, Martinez submitted fraudulent and doctored tax records that contained the forged signature of a tax preparer (the "Tax Preparer"). (PSR ¶ 16; Compl. ¶ 19). In fact, between April 2018 and April 2020, MBE had at most four employees and an average monthly payroll of no more than $25,000. (PSR ¶ 16; Compl. ¶ 10). Based on the false documentation provided by Martinez, Bank-1 issued a PPP loan to MBE in the amount of approximately $283,764, which was disbursed to a bank account controlled by Martinez and a family member. (PSR ¶ 16; Compl. ¶ 19(d)). The majority of the loan proceeds appear to have been used for purposes other than MBE's payroll and business expenses. (PSR ¶ 16; Compl. ¶ 19(d)).

4. The PPP Lender Scheme

In or about April 2020, Martinez submitted an application to the SBA for MBE to become a non-bank PPP lender. (PSR ¶ 17; Compl. ¶ 11). As part of the PPP lender application process, Martinez represented that MBE had originated and serviced over $3.8 billion in business loans or other commercial financial receivables for the three-year period from in or about 2017 through in or about 2019, and submitted fraudulent financial statements that purported to be reviewed or audited by the Tax Preparer's firm for the years 2018 (the "2018 Reviewed Financial Statements") and 2019 (the "2019 Audited Financial Statements"). (PSR ¶ 17; Compl. ¶¶ 11, 25-26). Based on the false information provided by Martinez to the SBA, MBE was approved as a non-bank lender for PPP loans on or about April 30, 2020. (PSR ¶ 17; Compl. ¶ 27).

At or about the same time, Martinez engaged in discussions with the Company in connection with a proposed partnership between the Company and MBE to fund PPP loans for minority and women-owned small businesses. (Compl. ¶ 32(a)). As part of the Company's due diligence on MBE, the Company requested certain documents and information from Martinez. (Compl. ¶ 32(a)). On or about April 27, 2020, Martinez submitted various documents to the Company—including the same fraudulent 2019 audited financial statements for MBE that were submitted to the SBA. (PSR ¶ 18; Compl. ¶ 32(a)). On or about May 13, 2020, Martinez, on behalf of MBE, entered into a participation purchase and servicing agreement with the Company, pursuant to which the Company agreed to provide $100 million to MBE to fund PPP loans that were purchased by the Company and serviced by MBE. (PSR ¶ 18; Compl. ¶ 32(b)). As part of this agreement, Martinez represented that MBE was in compliance with applicable laws and regulations and had complied with all documentation requirements under the PPP program and SBA regulations. (Compl. ¶ 32(b)). The same day, on or about May 13, 2020, the Company transferred $100 million to a bank account in the name of Republic Group, which was controlled by Martinez and his daughter, to fund the PPP loans to be issued in connection with the partnership between MBE and the Company. (PSR ¶ 18; Compl. ¶ 32(b)). Approximately six days later, in a May 19, 2020 CNBC interview, Martinez stated, in substance and in part: "What we're trying to

do is make sure we vet everybody to the standards of the SBA and assure that this money goes out because the next step in this procedure is working with a depository bank to multiply [the Company's] investment into a billion dollars or more." (Compl. ¶ 33). In fact, MBE lacked the requisite staffing and experience to administer the PPP loans at such a volume, resulting in the issuance of loans to those who were plainly ineligible as well as errors and delays in funding PPP loans. (*See* PSR at 30-31).

While Martinez was engaged in discussions with the Company, he also sought advances on pledges of PPP loans issued by MBE through the Federal Reserve's PPPLF. (Compl. ¶¶ 12, 34). Based upon MBE's status as an approved PPP lender, and the loan funds MBE obtained from the Company—both of which Martinez had procured based on false representations and doctored documents—the Federal Reserve issued substantial advances to MBE. Indeed, between approximately June 2020 and July 2021, MBE received 124 capital advances through the PPLF in amounts totaling more than $832 million. (PSR ¶ 18; Compl. ¶ 34). Under the PPPLF program, lenders could pledge PPP loans that had already been issued and funded as collateral in seeking additional funding from the Federal Reserve to issue new loans.[1] Law enforcement analysis of the data provided by MBE—including, on multiple occasions, directly by Martinez—to the Federal Reserve shows that MBE regularly pledged PPP loans that had not yet been issued in seeking funding from the PPLF program, and then used the funding the Fed provided to fund the very loans that were supposed to serve as collateral. These submissions subverted the structure and purpose of the PPPLF program. Ultimately, MBE pledged more in PPP loans to obtain PPLF funding than it ever actually issued. (*See* PSR at 31).

Because of the success of the scheme to defraud the SBA, the Company, and the Federal Reserve, MBE was able to issue in excess of approximately $900 million in PPP loans. MBE, and the defendant, reaped substantial financial rewards as a result. (PSR ¶ 18-19; Compl. ¶ 35). Ultimately, MBE was paid a total of approximately $71.3 million in fees, a significant portion of which Martinez used to pay for extravagant personal expenditures. (PSR ¶ 19; Compl. ¶ 35).

---

[1] The defendant argues that loans did not need to have been funded before they could be pledged as collateral to the Federal Reserve. The defendant is mistaken. For example, a Frequently Asked Question (or "FAQ") document regarding the PPPLF, attached as Exhibit 1, makes clear that loans had to be funded before being pledged. (Ex. 1 at 10-11 ("**41**. Can a PPPLF participant obtain an extension of credit under the PPPLF before it originates the PPP loan that secures it? No. A PPPLF participant must first make the PPP loan that it intends to pledge as PPPLF collateral, and then submit a request for a PPPLF extension of credit secured by that PPP loan."). The PPLF Letter Agreement, signed by each participant, and an example of which is attached as Exhibit 2, specifies that loans pledged as security must have been "originated or purchased by us" under the PPP, such that they are "(1) be fully guaranteed as to principal and interest by the SBA, and have been either (2) originated by us, or (3) purchased by us in accordance with the SBA's requirements for the sale and purchase of whole PPP Loans (in either case, such that we are the beneficiary of the SBA's guarantee of such PPP Loans)." Finally, the Government has conferred with the Federal Reserve's Office of Inspector General and confirmed with them that the program was designed to work as described here.

### B. Procedural History

On February 28, 2022, Martinez was charged by Complaint, arrested, presented, and released on bail. On May 2, 2022, the grand jury returned an Indictment charging Martinez in five counts: (1) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; (2) making false statements to the SBA, in violation of 15 U.S.C. § 645(a) and 18 U.S.C § 2; (3) bank fraud, in violation of 18 U.S.C. §§ 1344 and 2; (4) making false statements to a bank, in violation of 18 U.S.C. §§ 1014 and 2; and (5) aggravated identity theft, in violation of 18 U.S.C. §§ 1028(a)(1), (b), & (c)(4)-(5) and 2. (Dkt. 18). On January 19, 2023, the grand returned a Superseding Indictment charging Martinez with the same counts. (Dkt. 50).

On May 23, 2023, Martinez waived indictment and pleaded guilty, pursuant to a plea agreement, to a one-count Superseding Information. Count One of the Superseding Information charged Martinez with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. The conspiracy charged in the Superseding Information had two objects: the PPP Lender Scheme and the PPP Loan Scheme.

The parties stipulated in the plea agreement that the Guidelines offense level was 31, which would lead to an applicable Guidelines range of 108 to 135 months' imprisonment. Because the statutory maximum of imprisonment applicable to Count One is 60 months' imprisonment, however, the parties stipulated that 60 months' imprisonment is the Stipulated Guidelines Sentence. The Presentence Report, like the plea agreement, calculated the applicable Guidelines sentence to be 60 months' imprisonment. The Probation Office recommends a sentence of 60 months' imprisonment. The defendant request a below-Guidelines sentence.

## II. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

**B. The Court Should Impose the Stipulated Guidelines Sentence**

The Stipulated Guidelines Sentence of 60 months' imprisonment is an appropriate sentence in this case. While Rafael Martinez, like every defendant in every criminal case, is more than his worst conduct, the conduct here was egregious and deserving of a serious sentence. Through an interconnected fraud, the defendant took advantage of a national crisis to enrich himself enormously. Martinez lied to a bank to obtain his own fraudulent PPP loan, to the SBA to become a PPP lender, to the Company to get an initial $100 million in capital, and to the Federal Reserve to obtain an additional $832 million in capital. To accomplish the fraud, Martinez fabricated (among other things) financial statements, tax forms, and the signature of his outside accountant and tax preparer. As a PPP lender, Martinez's company hampered the proper administration of the PPP program, leading to complaints from desperate putative PPP loan recipients about MBE's handling of PPP loan disbursements. As a result of these calculated efforts to deceive, Martinez made tens of millions of dollars, purchasing extravagant homes, a private jet service, and luxury vehicles.[2] Martinez's conduct was shameless, systemically dangerous, and harmful. It was the

[2] Martinez asserts in his submission that "the $71 million in the fees that MBE earned was spent primarily on businesses." (Def. Mem. 32 n.28). Martinez is mistaken. The majority of the funds

selfish conduct of a con man driven by greed. To account for the nature and seriousness of the defendant's offense, promote respect for the law, provide just punishment, and deter similar conduct, a Guidelines sentence is warranted.

*First*, the defendant's misrepresentations about his business do not appear to have been an "utter aberration" (Dkt. 75 ("Def. Mem.") 1), but rather a regular course of dealing. The defendant appears to have used fraudulent MBE financial statements, which purported to have been reviewed and prepared by the Tax Preparer's firm, in connection with other business dealings prior to the PPP. These fraudulent financial statements date back to at least March 2019. Specifically, on March 14, 2019, the Accounting Manager of MBE emailed Martinez a word document named "MBECP 2017 2018 Financials."[3] The word document purports to be financial statements for MBE and is a variation of the 2018 Reviewed Financial Statements Martinez subsequently submitted to the SBA. Martinez later forwarded a lightly edited version of these fraudulent financial statements to his girlfriend and business partner, writing: "Boy if I can get this right, we could crush the profits."[4]

Martinez thereafter used these fraudulent financial statements in business dealings other than the PPP. For example, on April 15, 2019, Martinez sent to officials of the Export-Import Bank of the United States ("EXIM")[5] the same variation of the fraudulent 2018 Reviewed Financial Statements—almost exactly the same fraudulent financial statements that Martinez subsequently sent to the SBA in connection with his PPP schemes a year later.[6] Like the 2018 Reviewed Financial Statements, the 2018 financial statements sent to the EXIM were purportedly "reviewed" and prepared by the Tax Preparer's company. That was false. The only apparent difference between the 2018 financial statements sent to the EXIM and the ones sent to the SBA is that Martinez reduced MBE's "direct costs" by approximately $1.5 million in the version sent to the SBA, leading to a purported net income of approximately $7.055 million (as opposed to

went to accounts controlled by Martinez personally and to pay expenses for his personal benefit, as reflected in the agreed-upon forfeiture amount of approximately $44.5 million. (PSR ¶ 5(c)(v)).

[3] The March 14, 2019 email and attachment are attached as Exhibit 3. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties, including the Tax Preparer's company.

[4] The March 14, 2019 email is attached as Exhibit 4. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties.

[5] As described on its website (https://www.exim.gov/about), the "Export-Import Bank of the United States (EXIM) is the official export credit agency of the United States. EXIM is an independent Executive Branch agency with a mission of supporting American jobs by facilitating the export of U.S. goods and services."

[6] The April 15, 2019 email and attachment are attached as Exhibit 5. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties, including the Tax Preparer's company.

approximately $5.505 million in the version sent to EXIM). As another example, evidently in connection with one of his capital partner deals, on October 10, 2019, Martinez sent to a capital partner the same variation of the fraudulent 2018 Reviewed Financial Statements that were sent to the EXIM. The capital partner in turn forwarded them, copying Martinez, to an information technology services company for businesses.[7]

Significantly, while all versions of the fraudulent 2018 financial statements claimed millions of dollars in net income for MBE—approximately $5.505 million in the versions sent to the EXIM and at least one capital partner, and approximately $7.055 million in the version sent to the SBA—MBE's tax returns (which were, in fact, prepared by the Tax Preparer) reported a loss of approximately $78,625 for 2018. (Compl. ¶ 30(a)). Martinez did the same thing for 2019. Martinez submitted the fraudulent 2019 Audited Financial Statements to the SBA and the Company showing $7.255 million in net income for MBE, but reported a loss of approximately $4.5 million on MBE's tax returns. (Compl. ¶ 30(b)).

In short, Martinez doctored his company's financial statements, impersonating his outside accountant and tax preparer, so that he could claim to be a profitable business to potential business partners, including federal agencies of the United States, while hiding that profit from the Internal Revenue Service. The only conclusion that can be drawn from this course of conduct is that Martinez was consistently engaged in an effort to defraud others in order to enrich himself.

Incredibly, Martinez did not stop lying about MBE's financials even after he was participating in the PPP program as a non-bank lender and issuing millions of dollars in loans. On or about February 8, 2021, Martinez emailed the financial controller of MBE, writing:

> [T]hese are my numbers for 2020. We need to add the PPP volume and net income to these numbers. The only thing that I do not have is the interest costs for 2020 which I get in early March. That number should be about $8 to $9M. This will lead to a loss of about $2M or so for the year.

The attachment, named "MBECP 2020 Financials," presents the same financial metrics as the fraudulent 2018 Reviewed Financial Statements—though, in addition to being for a different year, these fraudulent 2020 financials claim that the Tax Preparer's firm *audited* the financial

[7] The October 8, 2019 email and attachment are attached as Exhibit 6. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties, including the Tax Preparer's company.

statements.[8] These obviously fraudulent financial statements were never reviewed or audited by the Tax Preparer's firm.[9]

*Second*, the defendant's submission elides over his victimization of the Tax Preparer—who is herself the principal and owner of a minority-owned small business. As noted above, the defendant regularly impersonated the Tax Preparer's firm while manipulating MBE's financial statements. In connection with his PPP loan application, the defendant went even further, *fabricating* IRS forms in their entirety and *forging the signature* of the Tax Preparer on those forms. Worse yet, in order to fabricate those IRS forms, Martinez used as a template the real IRS forms of yet another small business that had applied to MBE for a PPP loan.[10] In other words, to make his fake tax forms look legitimate, Martinez used the numbers from a small business's real tax forms, which Martinez only had in his possession because he was in the process of attempting, illegally, to become a PPP lender himself. From the very outset, Martinez was abusing his position as a PPP lender for self-gain.

The defendant seeks to downplay his egregious conduct in obtaining a fraudulent PPP loan, claiming that "even though [Martinez] provided inaccurate information about the number of MBE's employees and payroll at the time he applied for the loan, he subsequently hired more employees and increased MBE's payroll by an amount that ***exceeded*** what he represented in MBE's PPP loan application." (Def. Mem. 32). As an initial matter, the defense's claim that Martinez's fraudulently-obtained PPP loan was used as intended is a dubious proposition. First, the PPP loan program was not meant to subsidize *growing* a business and hiring new employees; it was meant to prevent layoffs during the pandemic. Second, as a factual matter, it is far from apparent that the loan was used for payroll. The bank account that received MBE's PPP loan funds was also used to fund a variety of Martinez's personal expenses. The tracing is complicated, however, because at or about the same time, the same bank account received an influx of $100 million that was fraudulently obtained from the Company. Second, the fact that Martinez later hired more people does not make his misrepresentations to Bank-1—via fabricated IRS forms, containing the forged signature of his accountant, which were created using the tax documentation of an innocent third-party small business that had applied to MBE for a PPP loan—any less egregious. The only reason that Martinez hired more people and had increased payroll was to

[8] The February 8, 2021 email and attachment are attached as Exhibit 7. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties, including the Tax Preparer's company.

[9] False financial statements were not the only lies Martinez told about MBE. For instance, Martinez represented to the Company that MBE had several prominent individuals sitting on its "board." In reality, at least several of these individuals were not board members, as confirmed when the Government spoke with several of them in its preparations for trial.

[10] Specifically, on or about April 9, 2020, Martinez was emailed the small business's PPP loan application. A comparison of the IRS Forms 940 contained in that small business's application with the ones used by Martinez is enclosed as Exhibit 8.

support his *illegitimate* PPP lending business. While Martinez's payroll increased, it only did so because Martinez compounded his fraud.

*Third*, the defendant's PPP Lender Scheme hampered the proper administration of PPP loans. Martinez submitted fraudulent information to the SBA in order to become a PPP lender, even though MBE did not meet the program's requirement. The fraudulent information MBE submitted specifically related to its prior experience as a lender; the defendant greatly exaggerated the financial success, and overall operations, of the company. This deprived the SBA of critical information it might have used to assess if MBE was equipped to serve as a PPP lender. Significantly, there is ample evidence that MBE was not, in fact, equipped to issue PPP loans properly and in the volume that it did based on the defendant's fraud. For example:

- At least one employee of MBE at the time has told law enforcement officials that MBE quickly became overwhelmed after being approved as a PPP lender, bringing in numerous individuals to vet loan applications who had no experience doing so and received minimal training. At least one group of such loan processors was led by the defendant's girlfriend, who did not have any experience in loan underwriting or vetting.

- Multiple loan recipients interviewed by law enforcement indicated that MBE "double-funded" their loans, issuing payments twice in error.

- MBE also sent at times PPP loan checks by email, or as scanned copies, which could not then be deposited by recipients into banks, forcing recipients to seek to have payments re-issued.

- MBE has an F rating with the Better Business Bureau. Their public profile includes numerous complaints related to errors in the PPP loan process. Indeed, in a February 2, 2021 email to several MBE employees regarding a complaint from a PPP loan recipient who had not been disbursed her funds in a timely fashion, Martinez wrote: "This is the typical email that I get more than 15 times a day and even after I reply to this lady and copy people in our office we still don't get back to people."[11]

- MBE appears to have issued numerous PPP loans to entities founded only after the passage of the CARES Act. The CARES Act required that businesses obtaining PPP funding be founded before the Act's passage – in part in an effort to prevent fraud on the program. Law enforcement efforts to verify data to fully understand the scope of this error were ongoing at the time of the defendant's plea, but the Government estimates that MBE issued in excess of $17 million in PPP loans to entities that were ineligible for PPP funding in light of this provision of the CARES Act.

(*See* PSR at 30-31).

---

[11] The February 8, 2021 email chain is attached as Exhibit 9. The Government has filed the exhibit with redactions to remove identifying information for uncharged third parties.

There is no question that the defendant was well aware that MBE, with its fraudulent financial statements and skeleton staff, was not equipped to handle hundreds of millions of dollars in loans for *thousands* of applicants effectively.[12] Yet Martinez proceeded ahead out of self-interest, earning himself tens of millions of dollars in fees that were paid regardless of the poor level of service provided to loan recipients or the inadequate diligence on loan eligibility. The defense suggests there was "no predatory motive" because PPP funds, ultimately, made their way to businesses via MBE. (Def. Mem. 28). But that elides over the fact that the defendant unquestionably knew that MBE could not fulfill the duties of a PPP lender effectively, and yet he repeatedly lied about its ability to do so in order to obtain a huge financial windfall for himself. Whether or not that evinces "a predatory motive" (Def. Mem. 28), it was classic fraud, born of greed and lies. Moreover, in addition to the shortcomings of MBE's loan processing, the defendant continued his fraudulent conduct while acting as a lender. He continued creating fraudulent financial statements, as noted above, and he also misused the PPPLF program to obtain over $800 million, improperly pledging as collateral loans that had not yet been funded by MBE.

The defendant's conduct warrants a substantial sentence. He regularly manipulated the financial information of his company for his personal gain, and that fraudulent conduct reached a crescendo with the PPP. While fraudulently becoming a PPP lender, Martinez himself obtained a fraudulent PPP loan—a brazen and outrageous act in itself given the circumstances of the COVID-19 pandemic, and even more so in the context of Martinez's contemporaneous efforts to become himself (via MBE) an arbiter of PPP loan eligibility. After becoming a lender through lies, Martinez then went on to illegitimately issue nearly a billion dollars in government-backed loans, hampering the proper administration of the PPP program along the way, but earning for himself tens of millions of dollars of ill-gotten gain. A substantial sentence is necessary to reflect the seriousness of the defendant's crimes and promote respect for the law. A strong message is also needed to deter others from lying to fraudulently secure scare government funds during a national emergency. Such a message is particularly important at a time when such crimes involving pandemic relief, which are often difficult to detect and prosecute, have become rampant. Indeed, Congress's Select Subcommittee on the Coronavirus Crisis identified up to approximately $84 billion in potentially fraudulent loans in the PPP and EIDL Programs.[13] There have also been few prosecutions of PPP lenders in particular,[14] increasing the deterrent value of the sentence in this

---

[12] To be sure, the PPP program was established quickly in response to a national crisis and its administration was not perfect. But the difficulties of administering an emergency funding program were only exacerbated by people like Martinez who brazenly defrauded it.

[13] *See* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2020-03-25%20Staff%20Memo%20-%20Small%20Business%20Fraud.pdf.

[14] *See, e.g.*, Alison Bennett, *Administration turning attention to banks in PPP fraud probe*, https://www.vacul.org/files/vacul/1/file/Newsroom/Latest-News/SPGlobal_Export_5-9-2022_cea6e8bd-8f4a-45e4-bbef-bdff1213b2d5.pdf (noting this case was "the first criminal prosecution of a PPP lender"); Marissa Koblitz King and Matthew Lee, *Lenders Are Newest Targets in DOJ's Paycheck Protection Program Fraud Prosecutions*, https://www.jdsupra.com/legalnews/lenders-are-newest-targets-in-doj-s-6116429/ ("The DOJ's expansion of prosecutions to lenders should serve as a warning to business and individuals that the

case. And deterrence in the context of a lender is more important than with respect to any individual borrower, given the systemic risks that a corrupt and ineffective lender poses. Illegitimate PPP lenders—like other commercial lenders who may seek to participate in governmental lending programs in the future—can do much greater damage than a single, individual borrower. Accordingly, the sentence imposed must demonstrate that the consequences of committing these types of fraud are severe.

## III. Conclusion

For the reasons set forth above, the Government respectfully submits that the Stipulated Guidelines Sentence of 60 months' imprisonment is sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: ______/s/______________________

Micah F. Fergenson
Katherine Reilly
Steven Kochevar
Assistant United States Attorney
(212) 637-2190 / -6521 / -2262

cc: Defense Counsel (by ECF)

---

government is laser-focused on investigating and prosecuting any fraud related to COVID-19 aid.").