N7RHMarS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        22 Cr. 251 (LJL)

RAFAEL MARTINEZ,

                                          Sentence
                Defendant.

------------------------------x

                                          New York, N.Y.
                                          July 27, 2023
                                          2:05 p.m.

Before:

                    HON. LEWIS J. LIMAN,

                                          District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
MICAH FERGENSON
KATHERINE REILLY
STEVEN JOHN KOCHEVAR
     Assistant United States Attorneys

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
     Attorneys for Defendant
BY:  MICHAEL S. SCHACHTER
     RANDALL W. JACKSON
     TELEMACHUS P. KASULIS
     ELKAN ABRAMOVITZ

N7RHMarS

(Case called)

MR. FERGENSON:  Good afternoon, your Honor.  Micah Fergenson, Kate Reilly, and Steven Kochevar, for the government.

THE COURT:  Good afternoon.

The defense.

MR. SCHACHTER:  Good afternoon, your Honor.  Michael Schachter, Randall Jackson, Tim Kasulis, and Elkan Abramovitz on behalf of Mr. Martinez.

THE COURT:  Good afternoon.

Good afternoon, Mr. Martinez.

All right.  So we're here today for the sentencing of Rafael Martinez.  On March 23, 2023, Mr. Martinez appeared before me and pleaded guilty to Count One of the information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. Section 371.  He did so pursuant to a written plea agreement with the government dated March 15, 2023.

In preparation for today's proceeding, I have reviewed a lot of materials.  I've reviewed the plea agreement and the transcript of the plea proceedings.  I've also reviewed and have in front of me the presentence report, which is dated May 19, 2023, and was revised on June 15, 2023, along with a recommendation and addendum to the report.

I've also received the following additional submissions:

N7RHMarS

Mr. Martinez's 36-page sentencing memorandum, which is dated June 27, 2023. The attachments and exhibits to that memorandum, which are Exhibits A to KK and include video exhibits and Excel spreadsheets. It also includes letters among the exhibits, letters from Mr. Martinez's daughters, sisters, clients, neighbors, friends, members of the clergy, a godson who speak to his charitable works, his contributions to the community, his involvement with the church, his volunteering at the public school, the after-school choir program or with feeding the homeless, his contribution to the local hospital, his support for organizations in the Dominican Republic, his work on behalf of minority enterprises, and the impact on him of the loss of his wife.

I've further received and reviewed a supplemental defense submission with an additional letter dated July 3, 2023, from the founder of the after-school chorister program that Mr. Martinez supported.

And I've received a further supplemental submission from the defendant dated July 10, 2023, with a letter from the defendant's brother.

I've also received and reviewed the government's submission dated July 5, 2023, with nine exhibits.

I also received and have a consent order of forfeiture.

Let me ask the government, first, whether the

N7RHMarS

government has received each of these submissions and whether the government is aware of any additional submissions of which I should be aware?

MR. FERGENSON:  We have received them, and we're not aware of any additional, your Honor.

THE COURT:  Mr. Schachter, should I be addressing myself to you or to one of the other lawyers?

MR. SCHACHTER:  Yes, please, your Honor.

THE COURT:  Have you received and reviewed each of those submissions?

MR. SCHACHTER:  Yes, your Honor.

THE COURT:  Are there any additional submissions which I should be aware?

MR. SCHACHTER:  No, your Honor.

THE COURT:  All right.  Let me now turn to the presentence report, and I'm cognizant that there may be issues of fact that the parties want to raise.  I have some issues —— questions with respect to the facts that I may have for the parties, but let's do first things first.

Mr. Schachter, have you received and read the presentence report?

MR. SCHACHTER:  Yes, your Honor.

THE COURT:  Have you discussed it with your client?

MR. SCHACHTER:  Yes, your Honor.

THE COURT:  And Mr. Martinez, have you read the

N7RHMarS

presentence report?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And have you discussed it with your lawyers?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Have you had the opportunity to go over with defense counsel any errors or anything else that should be taken up with the Court?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  So, Mr. Schachter, are there any unresolved factual issues to be taken up with the report?

MR. SCHACHTER:  I don't believe so, your Honor.

THE COURT:  All right.  Let me ask, Mr. Fergenson, have you received and read the presentence report?

MR. FERGENSON:  Yes, your Honor.

THE COURT:  Are there any issues to be taken up with the Court?

MR. FERGENSON:  No, your Honor.

THE COURT:  So hearing no objections, the Court adopts the factual findings in the presentence report, and the presentence report will be made part of the record in this matter and placed under seal.  If an appeal is taken, counsel on appeal may have access to the sealed report without further application to the Court.

Let me now turn to the sentencing guidelines.

N7RHMarS

Although the Court is no longer required to follow the sentencing guidelines, I am still required to consider the applicable guidelines in imposing sentence.  To do so, it is necessary that the Court accurately calculate the guideline sentencing range.

The plea agreement here calculates a guidelines range of 108 to 135 months of imprisonment based on an applicable guidelines offense level of 31 and a criminal history category of I, but because the statutory maximum for the crime to which the defendant has pled guilty is five years, or 60 months, the applicable guideline sentence is 60 months.  Probation agrees. I have independently calculated the guidelines, and I too agree.

The November 1, 2021, guideline manual applies to the case.  Pursuant to that manual, the adjusted offense level is 31, the criminal history category is I, the guidelines range is 108 to 135 months of imprisonment, but because the statutory maximum is 60 months, the applicable guideline sentence is 60 months.

The next subject I need to cover is departures, which is to say within —— whether there's a basis within the sentencing guidelines framework for there to be a departure. Had the guidelines range been 108 to 135 months and had that been the applicable guidelines range without consideration of the maximum sentence, I might well believe that there would be

N7RHMarS

a basis for a departure on the grounds that the loss overstated the gravity of the crime, but since the statutory maximum governs the applicable guidelines offense —— it governs the applicable guidelines sentence, I find that there is no departure available as a matter of law.  I'll address variances and the defense's request that there be a variance when it comes time to sentence.

All right.  Let me hear from the government with respect to sentence.

MR. FERGENSON:  Thank you, your Honor.  I won't rehash in depth the written submission that we've already put in, but I will make a few points.

I think the place to start, your Honor, is to think back to April 2020 when this city was at the epicenter of a national crisis related to COVID-19 and people saw their lives upended, their businesses being shuttered, their families and family lives in danger and disarray.  And what the defendant saw in April 2020 was an opportunity to take advantage of a national crisis to enrich himself enormously.  Judge Engelmayer, I know in several of these PPP fraud cases, has described this behavior as unpatriotic, and I think there's really something to that here.  And it's even more striking in this case, your Honor, where the defendant not only obtained a fraudulent PPP loan for himself via his company but then became an actual PPP lender.

N7RHMarS

I want to pause on that briefly because it's kind of stunning, your Honor.  In April 2020, the defendant obtains, fraudulently — he fabricates documents — a loan over $200,000 via PPP for his company.  He does that simultaneously while he's applying to become an arbiter of PPP loans, the one who actually decides who can — who's eligible to get the PPP loans and issues them.

Now, that would be pretty stunning in itself and, I think, would call for a serious sentence and would be a serious crime, but it wasn't just that his PPP loan was fraudulent at the same time he was trying to become a PPP lender, both were fraudulent.  It was totally illegitimate for him to become a PPP lender.  He lied in those applications.  It's not just he lied to a bank to get his own PPP loan.  He lied to the SBA, he lied to what we call "the company" in the complaint to obtain $100 million, and then he lied to the Federal Reserve holding himself out as a legitimate PPP lender and not following the proper procedures with obtaining Fed funds to obtain over $800 million.  It's a stunning fraud, your Honor.

THE COURT:  You said to obtain over $800 million?

MR. FERGENSON:  Via the fed's liquidity facility.

THE COURT:  Got it.

MR. FERGENSON:  And in the course of the fraud, he committed brazen acts of dishonesty and lies.  He fabricated documents relating to his business, financial statements, IRS

N7RHMarS

forms, forged his accountant's signature. That's close to as bad as it gets in business crimes, your Honor. And then as a lender, as a PPP lender, he hampered the proper administration of that program. And I'll touch more on some of these points in a moment.

But I want to be clear about one thing, which is that it's clear why he did all this. It was to get rich. He buys a $10 million villa in the Dominican Republic. He joins a chartered jet service, private jets. He buys a mansion in New Jersey. The PSR's description of it early on in the PSR is lengthy because it really is a mansion. And he also buys numerous luxury vehicles. It's classic fraud. He lied out of greed and he used that for lavish, lavish personal benefits for himself.

I'll briefly respond to a couple other points that the defense raised in their submission, your Honor.

THE COURT: Let me highlight a couple of things also that it would be helpful for you to respond to or elaborate on.

Paragraph 20 of the presentence report references, and I've now found, that the defendant pledged as collateral to the Federal Reserve loans that had not yet been issued and created the appearance of a functioning loan underwriting apparatus at MBE Capital which was, in fact, totally unqualified to underwrite loans. It would be helpful if you could elaborate on that. There is an issue that's been raised by the parties.

N7RHMarS

There's a footnote in Mr. Schachter's brief with respect to the way in which the loans were collateralized that would be helpful for me to understand.

You also in your papers made reference to a misrepresentation that was made at a later point in time, and it would be helpful for you to walk through the evidence with respect to that. And then it also would be helpful for you to walk through whether there's any basis for me to conclude that Mr. Martinez, having fraudulently obtained the right to become a PPP lender, to take your words, hampered the administration of the program or did something —— anything other than what the program was intended to do, which was to provide loans for enterprises to continue to employ their employees.

MR. FERGENSON:  Yes, your Honor.  So ——

THE COURT:  There may be other things, but those are some of the things that are on my mind, and I'm sure Mr. Schachter will be addressing them also.

MR. FERGENSON:  Understood, your Honor.  Just to take the first point first relating to the liquidity facility and the proper process for obtaining credit by pledging loans to the Fed, the defense had a footnote about it in their submission; we had a footnote in our submission.  We think it's clear that the process should have worked this way:  A lender issues a PPP loan.  Once they've issued that loan, they can ——

THE COURT:  Is that supposed to be with their capital,

N7RHMarS

is that right?

MR. FERGENSON:  Correct, your Honor.

THE COURT:  But then if the loan gets forgiven, what happens?

MR. FERGENSON:  I think it's just once the loan is disbursed and funded, finalized, the lender could then pledge that disbursed loan to the Fed, which the Fed would then hold as collateral in order to send additional funds to the lender. That's not what happened with MBE, at least in many instances. They were putting up loans as collateral for the Fed that had not been funded, and then they were using the money they got from the Fed to fund the loans.  That's just one of, I would submit — and I'll address this perhaps as the third point — but I think that's one of the hampering acts, as you might call them.

THE COURT:  And maybe it's obvious, but it would be helpful to hear you elaborate on why, in your view, that hampers the program.

MR. FERGENSON:  I think — so as we note in the submission, ultimately, they offer more loans than they ever actually fulfill.  So I think — I don't want to get too out of my skis on the fed's views, your Honor, but I think it relates to sort of systemic risk in the program, where they wanted to have at least some kind of check on the way they're sending money out the door.  Granted, there was a national crisis, and

N7RHMarS

the point of it is to get money out the door.

I think there was supposed to be some kind of check where lenders who are proven to be able to issue loans and fund them properly can then come back, pledge those loans to the Fed who will hold them as collateral to issue additional money. It's some kind of check where people aren't just, you know, collecting, unconstrained entirely, hundreds of millions of dollars in government funds. And I think that's particularly important when you have a company like MBE that was not actually qualified to be a PPP lender. It goes to the systemic risk that the defendant's behavior put into this very important program that people were depending on for their livelihoods.

To turn to —— unless your Honor has ——

THE COURT: Mr. Schachter on that point argues that MBE actually was appointed to do business with the government at an earlier period of time and that it was qualified.

MR. FERGENSON: I would respectfully disagree, your Honor. The facts as the government understands them at the time he became a PPP lender is that the defendant was basically a one-man shop. Like, maybe he had a few employees. His payroll at that time was negligible and leading up to that time, and to think that he somehow qualified to issue hundreds of millions of dollars to thousands of applicants is absurd.

I would also note, your Honor —— and this was a point I was going to turn to —— it wasn't just with the COVID program

that the defendant is submitting fraudulent financial statements, including to government agencies.  It goes back at least to March 2019 when he's using these just, you know, fraudulent purportedly accountant-reviewed financial statements, and he submits some of those to Export-Import Bank of the United States as part of an application even before COVID.

Your Honor also asked about a misrepresentation at a later point in time that we reference in our submission.  I take it your Honor's referring to the 2020 financial statements?

THE COURT:  That is what I am referring to.

MR. FERGENSON:  So it appears, based on email communications, that the defendant sends purported financial statements, supposedly for the year 2020, that are essentially identical of the fraudulent 2018 financial statements, except these 2020 statements now say not only were they reviewed by the tax preparer's firm, which was false for both 2018, for 2019, for 2020 —— she never reviewed any of them —— but in these 2020 ones, not only were they reviewed, but they were also audited.  And the numbers are basically —— I believe they're identical to 2018 almost.  Those are clearly fraudulent, and he's engaging in that conduct.  You know, the lies didn't just stop at the time of the applications.  I think that is a clear indication that he continued running his

N7RHMarS

business as if there's no difference between the truth and a lie.

And these financial statements in particular, your Honor, I think, are —— an important point to focus on is the relation they had with his tax records.  So in these years he has these fraudulent financial statements that he's sharing with potential business partners, including the Export-Import Bank of the United States, seemingly also, we describe in our submission, in relation to one of his capital partners, same type of fraudulent financial statements that he sends to the SBA, to the company in order to do this massive PPP scam.

And it's to potential business partners that his financial statements show profits of several million dollars, 5 million, $7 million.  But based on the records from his tax preparer, he's claiming losses for MBE in those years to the IRS.  And that's significant because he shows his profits to his potential business partners, or purported profits, and then he hides them from the IRS.  And it's significant because the way MBE is structured, those losses will carry through to Mr. Martinez's individual tax liability.  So he essentially gets to hide his income from the United States.

Your Honor, if you'll forgive me, I forget the third point.

(Counsel confer)

MR. FERGENSON:  Ms. Reilly reminds me.  It relates to

N7RHMarS

the administration of the lender program.  We address this in our submission, and I want to at least make a prefatory remark about the points we made, which is that because the defendant's fraud was in many ways systemic and so vast, it is difficult to quantify it and analyze it with specificity.  It would be such an enormous undertaking.

So we've tried to give you some bullet points to show and reflect that this was (1) an extremely risky and dangerous endeavor; it was a systemic risk that he created; and (2) there were, in fact, people harmed by it because he was totally ill-equipped to undertake this lending program at the scale that he attempted to do it.

So just to go through some of the bullets on page 10 of our submission, we interviewed at least one former employee of MBE who said that MBE was quickly overwhelmed, they had —— they were scrambling, and that ——

THE COURT:  Let me —— instead of having you go through each of them, I'll let you do that.

On the last one, you say the government estimates that MBE issued in excess of $17 million in PPP loans to entities that were ineligible for PPP funding in light of the provisions of the CARES Act.  What's missing from that representation is any sense of comparative performance of MBE with respect to others in the program.  I think it's known, and I could probably take judicial notice, that there were a number of

N7RHMarS

entities that were ineligible who received PPP money.  So it would not be anything exceptional that there were some in Mr. Martinez's cadre of clients.

What am I to make of the 17 million, if anything?

MR. FERGENSON:  May we just have a moment, your Honor?

THE COURT:  Yes.

(Counsel confer)

MR. FERGENSON:  Thank you, your Honor.

I think it's a fair question, your Honor, and it is difficult to quantify exactly how these would compare with other lenders.  I mean, one point to note is that this is the first prosecution related to lender fraud.  So we're, in a way, at the forefront of PPP fraud in this case.

THE COURT:  Yes, but you do know that there was borrower fraud, and so there must be some ability from the incidence of borrower fraud to form some judgment.

MR. FERGENSON:  I think there's no doubt, your Honor, and I guess the point to make is that there's no question there was PPP fraud, borrower fraud, and from many institutions.  I think this is meant to be reflective of the failures at MBE in particular, and part of, we submit, what leads to these borrower frauds at MBE is the total insufficiency of their lending program.  And even putting aside the fraud, I think the point that at the very beginning, when funds are needed most, when people are most desperate is when MBE is least able to

N7RHMarS

help them.

I wanted to address one other point, your Honor, which is that the claims of helping small businesses as the principal driver for Mr. Martinez's conduct, that claim just rings hollow, and I think that's for a few reasons. One is just what did he do? He got enormously rich, tens of millions of dollars, and then lived an extremely lavish life.

THE COURT: Is that out of the funds that the SBA pays? Is that how the ——

MR. FERGENSON: Correct, your Honor. This is SBA fees that go to MBE and principally to Mr. Martinez.

The other point is that it's contradicted by the way Mr. Martinez treats a minority-owned small business, the tax preparer's firm. He totally takes advantage of that small business, victimizes his accountant, all in pursuit of obtaining these huge sums of money.

And then the last point is just what I was talking about before, which is there's no possible way that the defendant actually thought he was equipped, essentially a one-man shop, to disburse hundreds of millions of dollars to thousands of needy people at the height of a national emergency. There's just no way.

The defense submits that the conduct wasn't that bad because there's no predatory motive. I think what they mean is that this case is a classic fraud like the vast majority that

N7RHMarS

we see in this courthouse, and it was an extremely serious one where the defendant put his own interests above others out of greed, and he got the money through lies.  It was classic fraud.  But at the time of a national emergency, like Judge Engelmayer says at these sentencings, it is also unpatriotic.

And just to end on one final point, your Honor, which is that, as I mentioned, there haven't been prosecutions related to PPP lenders and this is, as of now, a unique case, and for that reason I think deterrence is particularly important here.  When you place a government program, particularly a government program stood up overnight to try and address a burgeoning crisis, and when you take advantage of that and place it into systemic risk, not just the program but the people depending on the program, when you put yourself and your own greed above them, that deserves a substantial sentence for both specific and general deterrence.

And for those reasons, your Honor, we would submit that a guidelines sentence is appropriate in this case.

THE COURT:  I'll hear from Mr. Schachter.

I'm not sure, by the way, Mr. Fergenson, that, with all due respect to Judge Engelmayer —— and I have a lot of respect for Judge Engelmayer —— that I'm going to buy on to the language of "unpatriotic."  There are, in fact, a lot of people who appear in this court who engage in pretty bad crimes.  I'm not sure I'd label people patriotic or not patriotic, but I'm

not sure that much is —— whether I call the conduct patriotic or unpatriotic makes a lot of difference.

MR. FERGENSON:  Fair enough, your Honor.

THE COURT:  OK.  Mr. Schachter, let me hear from you.

MR. SCHACHTER:  Thank you, your Honor.

Your Honor, we are here because Mr. Martinez did the very difficult step of accepting responsibility for what he did.  He did that publicly, for all the public to see, for his family, and for his friends to see.  He unquestionably provided false information to the SBA as part of the loan process and as part of the application to become a nonbank lender.

I think that the Court's questions, which I want to start by addressing, go to the severity, the magnitude of it. And while false information was provided to obtain the status of being a nonbank lender, the government is wrong that he then went on to hamper the administration of the program, that he was totally unqualified, and that he did anything other than work as hard as he could to administer the program as he was supposed to.

I'd like to start by the first question about hampering the administration of the program.  I have had discussions with the government about what was intended with respect to the PPPLF program, and with due respect to the government and to whoever they're speaking to at the Fed, they are incorrect.

N7RHMarS

I'd like to hand up a screenshot from an instruction that the —— there's a video, we cited to it, where the Federal Reserve has just announced the PPPLF program, and they are explaining to the public, to lenders, exactly how it is supposed to work. And so when the government says that what Mr. Martinez was supposed to do, what MBE was supposed to do, was first extend a bunch of loans on their own and then receive the money from the Fed, that is very different than what the Federal Reserve itself was telling lenders, nonbank lenders.

May I hand this up, your Honor?

THE COURT: You may.

Have you shown a copy to Mr. Fergenson?

MR. FERGENSON: We emailed it to the government on June the 15th, and I have copies for Mr. Fergenson as well.

THE COURT: OK.

MR. SCHACHTER: Your Honor, if the Court were to review the video starting at 11 minutes 40 seconds, you'll see that the representative of the Federal Reserve says exactly what is supposed to happen, which is ——

THE COURT: Mr. Schachter, I know it's a case everybody feels passionate about. Maybe put the microphone a little bit lower or speak with a little less volume.

MR. SCHACHTER: I apologize, your Honor.

As you can see, in explaining how the program's supposed to work, the small business goes to the lender to get

N7RHMarS

the loan, then the Federal Reserve —— then the lender goes to the Federal Reserve in order to get the money which is going to be forwarded to the borrower.  You can see then it shows the line then is the Federal Reserve gives the PPPLF loan to the lender, and then after receiving the money from the Fed, the lender then provides the loan to the small business.  At least as the Fed was explaining it to lenders like MBE Capital at the time, the whole idea of this was the priority of the government was to pump money out to businesses so that they could keep people on payroll.  The problem for ——

THE COURT:  In your view, what does the collateral mean if this ——

MR. SCHACHTER:  The collateral ——

THE COURT:  If the money's just being funneled out before the loan is actually extended, how is it actually collateralized?

MR. SCHACHTER:  It is the pledged loan, the promise to repay the loan.  First of all, let's just keep in mind, it's not actually intended to be loans.  The purpose of this is the government wants to get money into the hands of small businesses.  The loans are intended to be forgiven, so ——

THE COURT:  Intended if the person ends up complying with the terms of the loan.  If they violate the terms of the loan, then the loan is not forgiven, correct?

MR. SCHACHTER:  100 percent.  However, the term is to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7RHMarS

use the money for payroll or business expenses.  So it's not particularly hard to meet those conditions.  The idea is we need to pump what was, I think, nearly a trillion dollars into the economy, and we need people to continue to pay their employees.  That was the government priority.  So while it's called a loan program, it is a bit of a misnomer.

In any event, the pledged collateral is the promise to repay, at least how the Fed explained it, and I can quote some of the words from the Fed representative as they were going through this slide.  The promise to repay the loan by the small business is the pledged collateral which then gets handed off to the Fed, and in exchange for that promised repayment, which the intent is that the SBA is going to forgive that loan, and the SBA is going to repay the Fed.  That's how the Fed is going to be repaid for the money that it is fronting.

And then — as you can see.  So the lender gets the promise to repay from the small business, passes that off to the Federal Reserve, and then you can just see the arrows.  Then the PPLF loan is made by the Fed to the lender and then from the lender to the small business.  The fear, as at least it was explained by the Fed to the public and to lenders, was we're worried you don't have the balance sheet.  You, lenders, are going to be worried about having the balance sheet to provide the money to the small businesses.  We don't care about that.  What we, the government, care about —

N7RHMarS

THE COURT:  Under your view, the lender needed to have no balance sheet whatsoever?

MR. SCHACHTER:  Correct.

THE COURT:  Zero?

MR. SCHACHTER:  That's actually correct.  They didn't need a balance sheet.  And the whole idea —— I mean, you were supposed to —— the regulations were you're supposed to just take the borrower's word for it.  Whatever paperwork the borrower submits, you are not supposed to effectively diligence that, and in fact ——

THE COURT:  In your view, was the lender supposed to have any substance other than to just act as a funnel, to have relationships to minority businesses or borrowers and funnel money out?

MR. SCHACHTER:  It was supposed to be in business and it was supposed to have payroll.  That was the purpose, because, again, the goal ——

THE COURT:  I mean the lender, not the borrowers; the lender, the person who's the intermediary in your client's position.  There seems to be a difference between you and the government.  The government sort of understandably argues, listen, these people who are intermediaries, the lenders, actually perform an important function, and they perform a quality control function, and there's some notion to the fact that they've got some capital and some employees.  And there's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

a way of reading your papers that just suggest, well, as long as the money ends up in the right place, it should be a matter of indifference to the federal government whether there ever was any substance to Mr. Martinez's business in the first place.

MR. SCHACHTER:  Sure.  So what matters is, at the time, what was the government's priority?  And the priority —— there's a reason why they turned to nonbank lenders in the first place.  The United States has plenty of banks.  Why did they turn to nonbank lenders even in the first place?  And the answer to that is the government issues, like, $350 billion, and banks do what banks do.  They want to curry favor with their clients.  And so what happens with that $350 billion, which is gone in an instant, is they lent money to the Lakers.  They lent money to Shake Shack.  They lent money to large law firms.  And the government was immediately subject to criticism.  The treasury was subject to criticism because people are saying, what the about small —— what about the small businesses that —— in particular, the minority businesses that are the lifeblood of the country?  And the banks, they're like, we don't know those people.  We don't —— banks don't —— they didn't care about the small minority-owned businesses.

And so it became an immediate priority of the treasury to find nonbanks, because banks aren't doing the job that is necessary of keeping small businesses, particularly minority

N7RHMarS

businesses, afloat. And so that is why they turned to nonbank lenders. And in particular, the Court would have seen in some of our exhibits the internal correspondence at the Small Business Administration. They made it a priority: We need to bring on MBE Capital because they know the people that the banks don't. The banks don't know minority small businesses. That's a bit of an overstatement, but it was a big problem.

And so you see in the internal correspondence of the SBA that the officials there are speaking about the importance of bringing on MBE Capital, presumably other entities that are in a lending function and have contacts with minority small businesses, because that is where the money needs to go, otherwise the economy's going to tank, otherwise we're going to have huge unemployment. In order to weather the storm, they needed to pump the money out to the people that really needed it, and the banks weren't doing that job.

You'll see in the correspondence that there are actually questions about the financial statements that were submitted. There are questions in the internal correspondence about does MBE have the wherewithal to manage this program. And in an internal memo they say there's inconsistencies in the financial statements, and then the day later the SBA says: Look, this is important. We need to get MBE, and presumably other minority lenders, we need to get them on track urgently, and that's why — that's why they were involved.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7RHMarS

And so Mr. Martinez worked too fast to get information —— and we obviously acknowledge it was false information, there's no question about that.  That's not why we're here —— to become a nonbank lender.  But the government is wrong by saying that he did not —— he and his employees did not earnestly work as hard as they possibly could in order to do the job that the banks were not doing, and your Honor sees that in the letters and the reviews that were submitted to MBE.

There's a letter from a man named Ricardo Villarreal who owned the Itty Bitty Inn in North Bend, Oregon, and he wrote to the Court about how he couldn't get a loan from banks after Oregon shut down hotels, and he had no way of paying his employees.  He couldn't —— he tried to go to banks, and the banks said they just had no interest.  They ignored him.  And he writes to the Court.  He doesn't know even what the nature of the charge is.  He writes that Rafael and MBE "demonstrated empathy and were respectful and quick to act."  He wrote to the Court how Rafael and MBE helped, in his words, "when it seemed that no one else would."

That's the reason why the treasury turned to nonbank lenders at all.  Were they perfect?  Of course not.  They were inundated immediately because there was overwhelming demand.  I presume the banks were too, and as the Court saw from the Inspector General report, there was fraud in the program. There were a lot of people that applied for duplicate loans

N7RHMarS

that didn't really have businesses, but the government understood that going in. That was the least —— at the time of that national emergency, that was the least of the government's problems. The focus at the time was we need to pump money out into businesses, and in particular small businesses, so that we can keep the economy afloat. And that's why they turned to nonbank lenders at all and that's why the SBA says there may be some inconsistencies in the financial statements and we're not really sure that they have the wherewithal to do the job, and the next day the SBA says they're approved. We need people with contacts in the minority community.

And when the government says that MBE and Rafael were totally unqualified, that's just —— I don't know where that is coming from because that is false. Mr. Martinez has spent his entire career focused on providing lending to small minority businesses. The way his business works is ——

THE COURT: The presentence report reflects that until he got the PPP money and got the qualification to become a PPP lender and started up on this business, he had —— and I'm now quoting —— "at most four employees who had a total average monthly payroll of no more than $25,000." Is that exactly the kind of entity that the federal government was using —— was intending to use to pump out money?

MR. SCHACHTER: Mr. Martinez had 65 people that were working for him going through the lending ——

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7RHMarS

THE COURT:  I know he ramped up.  He ramped up.

MR. SCHACHTER:  Correct.

THE COURT:  But he didn't have the kind of business before he ramped up, before he got the qualifications, that one would have expected to have for an entity that was a PPP lender, or am I wrong?

MR. SCHACHTER:  Well, I think, your Honor, I don't think that that's —— I don't think that's correct because, first of all, they didn't ask how many employees you have.  If that was important, they certainly could have asked the question how many employees you have.  They knew, the SBA knew ——

THE COURT:  The financials have to have some relationship to the magnitude of the business, right?

MR. SCHACHTER:  That is correct.  However, those numbers, you'll note —— look, this is not really a matter that the Court needs to take up, but those numbers do reflect the amount of lending that Mr. Martinez's business was involved in.  So I can describe the details of his business, but this was not a small —— I mean, it's not Bank of America, but they had a lot of clients.

The way it worked is these would be small businesses that are —— what they have are orders from General Motors, from Neiman Marcus, but they don't have the money to make their payroll today.  And so what Mr. Martinez's business is, and

N7RHMarS

he's been doing this for 20, 30 years, the business that ——

THE COURT:  He lends against the orders, is that it?

MR. SCHACHTER:  Correct.  He lends against the orders, and then he is repaid when General Motors or Neiman Marcus pays.  In fact, while he did that on his own for a time, he then also had funding sources who would provide the business to —— the money to Mr. Martinez that Mr. Martinez would then lend out to small businesses.  This has been a —— this has been his career.  And the Court has letters from some of the people to whom he allowed their businesses to stay afloat and grow.  The Court has letters from a number of individuals that talked about how their business would have died if it were not for Mr. Martinez's business.  They also speak to his mentoring, his empathy, and how he helped them.

So this is not a small business, and that is —— the government recognized that, different arm of the government, but as we wrote in 2017, MBE entered into a memorandum of understanding with the Department of Commerce's Minority Business Development Agency to provide over a billion dollars in financing to companies that were clients of the Minority Business Development Agency.

So the Department of Commerce specifically sought out MBE Capital to do business with Mr. Martinez's business because he was well-known in helping —— really caring about minority businesses and helping them find the financing they need so

they can grow, which, to the Department of Commerce, was an important part of their mission is helping small minority businesses.

And they sought out MBE Capital.  So for the government to say that Mr. Martinez's business was completely unqualified to do this, well, somebody should ask the Department of Commerce, because the Department of Commerce specifically sought out MBE and said will you help us provide —— we tried to provide business counseling to minority businesses.  Will you help us to —— when people come in, when minority businesses come into the Department of Commerce for help, we want you, MBE Capital, to assist those businesses in obtaining financing, because their business was a recognized expert in the field.

So then a year after entering that memorandum of understanding, in 2018, all before this offense, all before his application, MBE was awarded the Minority Business Development Agency's Access to Capital Award after financing $970 million in accounts receivable and helping its clients grow an average of 31 percent.  That's not Mr. Martinez that's saying that, that's the Department of Commerce.  And it's —— Exhibit J to our papers is the Department of Commerce's Minority Business Development Agency's press release.

So, yes, he was qualified.  Yes, his business was qualified to manage the program as it was intended, and then

N7RHMarS

they did.  They did what the banks couldn't do, which is the reason why they turned to him in the first place, which is they made smaller loans than the banks were, because the banks' clients were larger.

But there are people, there were businesses, thousands of businesses —— they issued $900 million in loans to 37,000 companies.  And by the way, they tried their hardest to ferret out what was going to be fraud in applications everywhere.  They turned down 80,000 loans.  And you saw in the exhibits that we submitted there were times when the SBA would pressure —— they would turn to MBE and pressure them:  You need to move faster.  You need to move faster.  Why aren't you getting the money out?  We need you to do that.  And MBE's response was:  Look, we're doing our best here.  We're trying to check the materials that you're sending.  But that wasn't the government's priority at the time.  The government's priority was getting the money out.  And with respect to MBE, the job that they wanted MBE to do was to get the money out to minority small businesses, and that's what they did, which Bank of America and all the —— every other bank couldn't do.  That's what they did.

They didn't issue loans that were a million dollars, $2 million, because that wasn't who they were; that wasn't who they had contact with.  They were getting the money out to businesses with smaller payrolls.  And so most of their —— vast

N7RHMarS

majority of the loans are under $200,000 to businesses like the Itty Bitty Inn in North Bend, Oregon, that couldn't get the banks to pay any attention to them. So they did the job they were supposed to.

Mr. Fergenson speaks about are 17 —— in their papers the government noted that there were $17 million of loans that were not eligible, and I just want to be clear as to what the reason for that was. The eligibility was supposed to be your business was supposed to have existed, I think, a year before the pandemic, and you were supposed to submit some kind of paperwork that would establish that the business had been in business a year earlier. So it's not that, in fact, that $17 million did not go to completely legitimate small businesses that had payroll that were going to be unable to make their payroll if they didn't receive a PPP loan. The issue is whether or not they correctly checked the box of being in business one year before the pandemic or some period of time before the pandemic.

And I just want to note that's correct, but 17 million out of $900 million in loans is about 1.8 percent, which we all know from the Inspector General's report there's far more —— we're not even saying —— the government's not saying those are fraudulent loans. The government doesn't know if those are fraudulent loans. They don't —— they maybe have been used for the actual purpose that they were intended, to pay payroll, to

keep the businesses afloat, but even that 1.8 percent is far less than the fraud rates at Bank of America or anywhere else.

So I don't know if I —— I tried to respond to what I heard to be the Court's questions about the offense, and it's a serious one. Our papers, we hope, were clear that Mr. Martinez, he has accepted responsibility and is filled with remorse for what he did. We're only talking about —— is this, you know, an unpatriotic act? How does the Court measure the nature of the offense, the severity of the offense, because the Court needs to do that?

I should note just one other thing before I move on. The Small Business Administration in August of 2020 —— we attach this in our papers —— they specifically wrote that Rafael had been "incredible to work with" —— and I'm quoting from the SBA —— "and a game changer for so many" and then nominated him for the Small Business Administration's national award.

So I think the Court's questions were how do I —— how does the Court identify the severity of the offense which he has acknowledged? And in particular, then, how then does the Court weigh, because that's one factor that the Court needs to consider, but there is, also, how does the Court put —— factor in the nature of this offense, but how does it weigh that alongside the history and characteristics of Mr. Martinez? Which I would like to move to, but I want to make sure those

N7RHMarS

are the questions the Court has ——

THE COURT:  No, that makes ——

MR. SCHACHTER:  —— about the nature of the offense.

THE COURT:  I may have some follow-up questions for the government on the nature of the offense, and then I may go back to you on that, but I think it makes sense for you to cover the character of the defendant.

MR. SCHACHTER:  Thank you, your Honor.

So in a case called *United States v. Adelson*, the court in that sentencing case said very meaningful words.  The court wrote:  "Surely if ever a man is to receive credit for the good he has done, it should be at the moment of sentencing when his future hangs in the balance."  The court there wrote that it is an elementary principle that is basic to all the great religions, moral philosophies, and systems of justice that a person's instance of misconduct has to be assessed in the context of his overall life.  And the letters that have been submitted to the Court and the outpouring of support in the courtroom today, they are testimony to the very —— to the good that Rafael Martinez has done in his life.

The Court has not —— obviously, the moments where the Court has had the opportunity to spend any time with Mr. Martinez are, obviously, fleeting.  That's the nature of the system.  Mine, ours, have been much more in depth, and we have gotten to know Mr. Martinez very well.  We have gotten to

N7RHMarS

know his family very well and his friends well, his employees. And one thing that I pray has become very clear in the papers and in the words that those people submitted is that Rafael is a good man, and I mean that in just the truest sense of the word. He is warm, he is kind, and he has led an exemplary life which has been dedicated to acts of kindness, acts of charity, of helping others, of making a difference in the lives of others.

And I had the circumstance where when I was reading — when I would speak to his daughters — and I've met them a number of times — and when I would hear their words, I felt bad because it made me feel like I should have been a better father, like I should have been a better — like I should have been a better husband because — and it's not just words, they're not just platitudes, but they're actual instances where he just imbued the right lessons in his daughters. When his wife passed, that he so took on the idea that he is now father and mother to his daughters, and I didn't have that. I didn't go through that kind of trauma, and I just — it made me feel I should have been better.

And it is not just family, which I want to spend time on, but it's also his business. Because the letters from the people that he worked with, people that he helped arrange financing, they don't speak to purely a business relationship, yeah, this is a guy that I entered into a contract with; he got

N7RHMarS

me financing.  But they speak about how they couldn't have grown their businesses without Rafael, how Rafael mentored them.  And the letters show about how he used whatever success he achieved through his minority lending business to help others, and you heard how he always has.  You saw the letter from his sister about how, when Rafael at age 13, got his first job and got his first paycheck, he went out and bought them a hula hoop, which his mother who cleaned houses in Washington Heights couldn't afford to do.  Rafael's instincts, even at age 13, were to go use what he got to help others, and he carried that through his entire life.  You read about how he worked to level the playing field for disadvantaged kids in Washington Heights, preparing them for life in business by trying to sponsor a golf camp, sponsoring a soccer league.  This is all well before the pandemic.

He created EntreFamilia, which provides professional and educational opportunities for those in the Dominican community.  You have in the courtroom representatives from the community who are here to support Rafael because his work has mattered so much.  People like representatives from Congressman Esplanade's office, from Senator Booker's office, from Senator Menendez's office, people from his church are here because of the good work that Mr. Martinez has done, Reaching New Heights, the organization that he and his wife formed which was dedicated to introducing careers like aviation to students of

N7RHMarS

color.

You also saw in those letters about his kindness. A woman named Sweta Shah told the Court about how she had tears in her eyes when her husband told her about how Rafael had volunteered to take their 17-year-old who was special needs —— he's nonverbal, can't use —— can't go to the bathroom on his own —— and Rafael volunteers, I'll take him. I'll take him to go see the holiday lights at the Bronx and is always around caring for him. She wrote that "it is great to know that there are still people like Rafael in this world who would do anything to give a little joy to our son who has no friends."

That is character. That is the history and characteristics of a person that matters most at this time. It's not an act for anybody to see. It is not an act that improves his business or his reputation. It is just something that is so kind but also too intimidating for the vast majority of us to take on something like that, but it speaks to who he is.

I hope, your Honor, that in assessing his history and characteristics that the Court has seen that he is just a really good father and grandfather. And I'll describe some of the instances that really moved me.

THE COURT: One thing you might also address —— I probably should have said this earlier when I was talking about the guidelines —— if the guidelines that apply to this case

N7RHMarS

were 108 to 135 months, I might very well consider a departure to be appropriate on the grounds of exceptional good works, as well as loss overstating the gravity of the offense, but the statutory maximum is 60 months in this case.

And so the question in my mind, as I balance all of the factors, is why shouldn't I consider the good works to be effectively factored into the statutory maximum?  In other words, if the sentence and guidelines were 108 to 135 months, there's no doubt in my mind that that would not be the sentence.  Your client would not receive a sentence within that range and wouldn't receive a sentence in that range in part because of his history of good works, but that's not the range that we're talking about.  We're talking about five years.  And the question for me is within the five, since I can only impose five years, what kind of discounting —— should there be any discount to the five years on the basis of the good works?

So you'll address that as you're going through things, but I just wanted to lay it out on the table in terms of what I'm thinking about so you can address it.

MR. SCHACHTER:  I appreciate that, your Honor.  And as a prosecutor, I often when there was —— kind of a while ago —— I would often think when it came time for sentencing —— I felt like my job was to make sure the facts came out, that the facts were acknowledged publicly for all to see, but the issue of sentencing was one that I was very pleased that I really had

N7RHMarS

nothing to do with. That my job is to provide the facts to the guy in the black robe, man or woman in the black robes, and I got to wash my hands of that, because how much time should someone be locked away and what good is served by that is really hard.

And I guess I would put the question differently and not as what is the discount that should be applied, but I would think about it as what good comes from this? What is the —— however long Mr. Martinez is incarcerated, his mom, who doesn't know anything about the offense because he can't, the woman that was mother and father to him because the father left the family very early on, is 90 years old. And however long at age 90, however long he is to be incarcerated, the great likelihood is that he will miss the end of her life.

He has small grandchildren that he cares for. He is, obviously, a centerpiece of the daughters that he raises, and he does every day enormous amounts of good for society. So I think the question is to the Court, for the Court, what does justice demand? Is the Court serving —— what amount of time does Mr. Martinez need to be locked away from society, warehoused in a facility to serve society's interests? Is the world a better place? And the world has plenty of interests, one of which is deterrence and all that. I don't mean to suggest there aren't countervailing —— there are a whole bunch of issues that the Court needs to assess, but at bottom, I

N7RHMarS

think the question for the Court is not how much discount should I give from the guidelines, but rather, how much time do I need to lock away this individual from his family, from his friends, and from the society that he serves ably, how much time do I need to do that in order to have justice be done?

THE COURT:  That's a fair point.

MR. SCHACHTER:  Is justice more served if it's two years than one year?  If it's five years than two years?  Have we served society by doing that?  And for some people ——

THE COURT:  You make a fair point and a point that's consistent with the parsimony principle.

MR. SCHACHTER:  And part of that is assessing the good that Mr. Martinez does when he's not locked away in a facility, and part of that is the good —— and we need to assess the offense, but just as equally, if not more, we need to assess who he is.  And he is also a really good father and a good grandfather.  And in the letters to the Court, his daughter Samantha, who was born with cerebral palsy, wrote about how he coached her fourth grade basketball team, and as opposed from dissuading her doing that, he took on the coaching and then tried to arrange plays that would not tax her weaker left side; how he taught her to dance so she would be —— so she would know how do that despite the weaknesses in her ankle that comes with that disease; how he —— one that moved me and made me feel bad was how he would schedule date nights with his daughters so

N7RHMarS

that he would —— they would know how they're supposed to be treated by a man that they're with.

And they would write about how he would talk about the bigger pictures in the life and is still teaching me and guiding me to be a strong mother of two; how he made sure that he took his daughters every year to feed the homeless.  His daughter wrote:  "Every year on the day before Thanksgiving, my father would rally our family, and we would prepare 500 to 1,000 packed lunches.  He would drive us around New York and New Jersey to hand them out to those unhoused and less fortunate.  Every year my father would help my sister and I arrange Christmas dinners at multiple shelters throughout New Jersey so we could feed families around the holidays."

They wrote about —— I thought this was —— he instilled the following, they described, as the lesson:  That he taught his daughters, "You can have everything in the world but are nothing if you don't help your neighbor.  He wanted to make sure that we understood that everyone should be treated equally."

They wrote about how he donated hundreds of turkeys to families in Washington Heights.  And his daughter Samantha called her dad one of the greatest inspirations and the most caring person she's ever met, and how he to this day now watches her two-year-old —— his two-year-old Jacob and their —— her brand new baby Ava for his daughter Chelsea.  And she wrote

N7RHMarS

to the Court about how she fears that Rafael's incarceration would send her into a dark place and how lost she would be.

And in going through the list of what are the history and characteristics of Rafael, he was also, obviously, an exceptional husband.  Chelsea wrote that:  "I idolized my parents and was always in awe of their relationship.  There was something special about their partnership.  I was always so fond of how my father treated my mother.  He was always so kind and present.  He really knew how to connect with her and put a smile on her face even during the toughest of times."

I was moved by a letter from a friend named Mindy Adams who wrote:  "After his wife Ina was dying, that every few months Rafael would tell Ina to pack a bag only to disclose the temperature of the location that he had planned to take her. She knew nothing until she got to the plane.  He gave her hope."

Herman and Brenda White wrote about how he would carry her back and forth from her sickbed to the bathroom.

Dr. Sharon Banks Williams reported what one of Ina's doctors said to her group of friends:  "He has restored my hope in family" —— this is the words from the doctor.  "He has restored my hope in family after observing his myriad of kind interactions with his wife, thus extending her days beyond the time of medical science."

And then after she passed, he honored her memory.  He

N7RHMarS

gave hundreds of thousands of dollars to a hospital in Englewood earmarked to help women of color who lack health insurance to get cancer screenings so others wouldn't have the same fate that Ina did.  He renovated a local recreational center which was named for Ina.  He gave $400,000 to renovate a community center in Newark.  He is building a community center in Washington Heights to be named for Ina where underprivileged children will find a safe space for tutoring and a hot meal.  He annually provides for a hundred scholarship for students at Cardinal Hayes school where Mr. Martinez attended and was in constant fear that he would have to —— would be thrown out because of the inability to pay the tuition.

And so I think the question for the Court is —— because those factors are just as important as the nature of the offense.  There is no suggestion in the law that the history and characteristics of the defendant matter less than the nature of the offense.  They are part of the entire set of facts that the Court needs to consider when making the assessment of how much time locked away serves the interest of society and of justice.  And I think that we hope that the Court, in fashioning a sentence for what is obviously also Mr. Martinez's first criminal offense, is able to put appropriate credit —— we know the Court will —— put appropriate credit in weighing the life that he has lived and the person that he has been in determining an appropriate sentence.

N7RHMarS

THE COURT:  Thank you, Mr. Schachter.

Let me ask one question of the government, then I'll give you, Mr. Schachter, a chance to respond.  I don't mean to limit the government if there's anything further the government wants to say.

It's not clear to me from the government's presentation or from Mr. Schachter's presentation the materiality of the misstatements that were made to become a PPP lender.  I can hear what Mr. Schachter says to suggest that SBA asked the wrong question in terms of the number of employees; the financials are sort of not particularly relevant.  What's the government's view?

MR. FERGENSON:  Just one moment, your Honor.

Yes, your Honor.  I think —— so I'm glad your Honor asked the question, because there was one point I wanted to address from the defense's presentation which relates to the action memo by SBA upon an initial review of materials submitted by MBE, by Mr. Martinez.  And you'll note that the action memo talks about how there are no 2019 audited financial statements, and they reference it a couple times, even in the bullets in the defense's submission.  And then the defendant submitted fraudulent 2019 audited financial statements that had not been prepared by the tax preparer firm, and they certainly had not been audited.  That is —— you know, the SBA views that and says, OK, an outside auditor vouches for these financials

N7RHMarS

which show that they are processing a significant number of loans.

And the broader point, your Honor, is that if they were just some kind of go-between who had no function in the PPP system, one, there would be no point to use them, and second, they wouldn't get the fees that the SBA was paying lenders.  Obviously, they're being paid to do something, not just send money to anybody who sends them something.  And Mr. Martinez, through MBE, was paid over $70 million in those fees.

THE COURT:  Anything further from the defense?

MR. SCHACHTER:  No, your Honor.

THE COURT:  OK.  Mr. Martinez, you're not required to address the Court, but if you would like to, now would be the time.

THE DEFENDANT:  Thank you, your Honor.  Could I use the podium?

THE COURT:  Maybe you can move over.

THE DEFENDANT:  Can I use the podium?

MR. JACKSON:  Your Honor, is it all right if Mr. Martinez remains seated?

THE COURT:  He can remain seated.  But maybe, Mr. Jackson, he can move closer to where you are or Ms. Reilly could move over.

THE DEFENDANT:  Or could I use the podium?

N7RHMarS

THE COURT:  Whichever you'd prefer.  It's whatever's easier for you.

THE DEFENDANT:  Thank you.

This is tough.  Your Honor, members of the court, my family, friends, and everyone else present today, I stand before you with a heavy heart burdened by the weight of my actions.  It is with genuine remorse, deep regret that I address this Court today seeking an opportunity to express my heartfelt apology for the choices I have made.

I know the gravity of my transgressions and the impact they have had.  I know that impact has been felt by people close to me, people in the community I have never even met, and many others.

Judge Liman, I humbly request your understanding and mercy as I take responsibility for my actions.  First and foremost, I want to emphasize that I deeply understand the harm I have caused.  I know that my actions have violated the law and eroded trust placed in me by so many people over an almost 35-year career.  I deeply regret the pain and distress I have caused to my daughters, my family, everyone in the wider community affected by my actions, not to mention my late wife, as I let her down and will have to live with that the rest of my life.

In the wake of my actions, I have had a lot of time for introspection, a lot of time to reflect on the gravity of

N7RHMarS

my mistakes.  Your Honor, I feel deeply within my heart that this would not have happened if my wife was still here.  My wife of 30 years —— and we were together for 35 —— she was my wife, my friend, my guardian, my lover, many times my therapist, and my biggest cheerleader.  I think so much of my mistakes, thinking, and my actions that led me here were me trying to fill a hole in my life that was there after she passed.  She was and will forever be the rock of our family, not only for myself and my daughters but my entire family and community.  I thank God every single day that she was around long enough for my daughters to see what a true Wonder Woman she was.

I spent every week for five years taking my wife to chemotherapy and seeing her die slowly, seeing her die slowly and knowing that I had to continue raising two girls on my own, which was not a small thing, as I am no match for who I was —— who my wife was.  After she passed, I was lost.  I thought things would get better, but they only got worse and very dark. I tried putting on a strong front for my daughters but could not be around them too long as I was reminded of their mom and would start crying like a baby.  Feeling desperate at some point to find some new source of validation and purpose, I allowed myself to go down the path that led me to here.

I know that my trauma does not in any way excuse my horrible mistakes, your Honor, but I only want to give you a

N7RHMarS

window into the —— my best attempt to figure out how, looking back on all these mistakes, I was able to become so lost and so off course.

My family has been the rock and my source of strength —— my daughters, my departed wife, my mother who scrubbed floors to provide for my sisters, my brother, and myself as a single mom growing up. When I lost one of the pillars of my strength, I allowed myself to collapse in a way that I will never forgive myself but that I hope my family will eventually be able to forgive me for.

Your Honor, I pledge to use the experience as a catalyst for personal growth and as a reminder of the value and of moral integrity I have followed and taught others my entire life. I am deeply committed after serving my sentence to again being a law-abiding citizen who will contribute positively to my community. I will seize every opportunity to make a meaningful difference —— difference, to learn from this experience, and to help prevent others from making similar mistakes and to repay every cent that I can.

The one extremely bright moment and spot in this period of personal darkness for me is that even as I mentally prepared for this sentencing, I became a grandparent for the second time. It has been the joy of my life and an unexpected blessing that this moment has allowed me time to help my daughter spend —— and spend time with my two grandchildren, as

N7RHMarS

well as my daughter Samantha, who is such a wonderful inspiration to me and has achieved so much even with cerebral palsy. I believe that the chance for me to contribute as a grandfather is a turning point for me starting with a brighter and new chapter of my life, and I deeply hope I can come home in time to help as much as I can and see as much of their early lives as possible.

Your Honor, members of the court, and those who have been impacted by my actions, I understand the pain and disappointment my actions have caused. I am mindful of the trust that has been broken. I respectfully request any leniency your Honor believes is appropriate in assessing my punishment. Whatever the Court's decision, I will strive to make amends and rebuild my life on a path guided by integrity, responsibility, and my faith in God.

Thank you so much, Judge, for your attention and understanding.

THE COURT: Thank you.

I'm going to retire in a moment to the robing room. Before I do so, I have a couple of questions for the government, not about the facts, and I'll permit the defense to be heard, obviously, with respect to these also.

First of all, I noticed from the presentence report that it's recommended that I impose restitution. There's a figure for restitution. Is there a consent order of

N7RHMarS

restitution, and is restitution applicable in addition to the order of forfeiture?

MS. REILLY:  Your Honor, there's consent as to the restitution amount.  It was included in the plea agreement.  We don't have an order prepared today, your Honor, but we propose to submit one within seven days.

THE COURT:  All right.  That will be acceptable.

The second question has to do with some of the recommended special conditions of supervised release, and I'd be interested in the views of both sides with respect to this.

In particular, I'm thinking about the recommended special condition of the search condition or —— and of the requirement that if the probation officer determines that Mr. Martinez is a risk to another person, that he notify the person about the risk and comply with the instruction and whether those conditions really are necessary based upon the facts of this case.

MR. FERGENSON:  Yes, your Honor, I don't think the government has any objection to not including those conditions in this case.

THE COURT:  OK.  I don't think, Mr. Schachter, you need to be heard with respect to that.

All right.  I'm going to retire for a couple of minutes, and I'll be back on the bench.  Thank you.

(Recess)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:22-cr-00251-LJL   Document 85   Filed 08/29/23   Page 51 of 63    51

N7RHMarS

THE COURT:  Be seated.

All right.  Mr. Fergenson, is there any reason why sentence should not now be imposed?

MR. FERGENSON:  No, your Honor.

THE COURT:  Mr. Schachter, is there any reason why sentence should not now be imposed?

MR. SCHACHTER:  No, your Honor.

THE COURT:  As I've stated, the guidelines range is 108 to 135 months, but the guideline sentence applicable to this case is 60 months because of the statutory maximum.

Under the Supreme Court's decision in *Booker* and the cases that have followed it, the guidelines range is only one factor that the Court must consider in determining the appropriate sentence.  The Court is also required to consider the other factors set forth at 18 U.S.C. Section 3553(a).  These include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the guidelines range; any pertinent

(212) 805-0300

N7RHMarS

policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who've been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

The Court is also required to follow the parsimony principle.  It's required to impose a sentence sufficient but no greater than necessary to comply with the purposes set out above.  I find that the sentence I'm about to pronounce satisfies the parsimony principle and is sufficient but not greater than necessary to satisfy the purposes of sentencing I've just mentioned.

I've given a lot of thought and attention to the appropriate sentence in this case in light of the Section 3553 factors and the appropriate purposes of sentencing.  I've been helped a lot by the lengthy submissions of the parties and by the lengthy argument of the parties, as well as by the defendant's comments.

As Mr. Schachter anticipated, among the primary factors that drive a sentence are the gravity of the crime, the need for just punishment, and the need for the sentence to promote respect for the law, as well as to promote and serve the interests of general deterrence.

The government is right here to emphasize the gravity of the crime.  Mr. Martinez took advantage of a true national crisis to illegally enrich himself.  He lied to the federal

government to get a loan of over $283,000 and then, having procured that loan or being in the process of doing so, he lied to become a qualified Paycheck Protection Program lender.  He did so in ways that were unmistakably criminal, making up audited financials, forging his accountant's signature.  And the conduct was repeated.  It wasn't isolated.  He made similar misstatements to others over a period of time.

Each aspect of Mr. Martinez's crime, the lies to get a loan for himself and his business and the lie to become a qualified PPP lender, is deserving of punishment.  The PPP was designed to provide emergency financial assistance to persons at a time of extreme crisis in this country, to persons who were suffering the economic effects of the COVID-19 program. It was designed to help ensure that employees would continue to be paid and to receive their paychecks.  It was not designed to enable someone to build up their business or to obtain profits from the largess of the government.

At the time Mr. Martinez applied, there was no assurance that there would in fact be enough in the program for those who were truly in need.  The program had once run out of congressional funding.  There was a second tranche, and there was no assurance that, when Mr. Martinez dipped into the PPP program, that there would in fact be enough money for everybody who was truly in need.

In addition, that program and other programs like it

N7RHMarS

rely on persons who apply for loans to be truthful and honest and forthright. The integrity of the whole system, the ability of the government to engage in similar programs is undermined if the government can no longer trust persons who apply to be truthful in their applications.

In this respect, I place very little weight on the defendant's argument that the funds he borrowed ultimately were used to hire employees. I recognize there's some dispute of fact as to that issue, with the government saying that it can't trace all of the money that Mr. Martinez received, and I accept the notion that the money was used to hire employees, but that does not excuse or particularly mitigate the conduct. There's no question that Mr. Martinez was not entitled to the loan and that he profited from it. And he did so by lying, and that was wrong.

Mr. Martinez's second wrong, and a wrong that is at least equivalent to the first one, was to lie to the SBA and others about the financial condition and performance of his business to become a PPP lender. It is important to highlight the gravity of that crime itself. The PPP program was adopted at a time when the country, the government, was vulnerable. It relied upon PPP lenders to disburse the funds to borrowers. The PPP lenders were not just pass-throughs. I reject the notion that they were pass-throughs. They were entrusted by the government to perform an important function in the public

interest.  And the financial information that Mr. Martinez provided was important to the government and its oversight in deciding to entrust him with that responsibility.  He lied to get that responsibility.  That was unquestionably wrong.  It did damage to the program.  It did damage to the trust that that program and other programs need in order to survive.

There is a suggestion in the defense papers at times that the lies should be treated as a matter of insignificance or that they should be excused; that the good that Mr. Martinez did in disbursing the funds to minority businesses somehow outweighs the harm that he caused by cheating the government to become a PPP lender in the first place.  I reject that view.

First, the evidence does not support that Mr. Martinez engaged in this business out of some kind of altruism.  I believe it supports, I think it amply supports, that he did so for profit and out of a desire for money and more money and, in some respects, out of greed.  That doesn't make Mr. Martinez evil.  I don't believe that he's evil.  I believe, and all the evidence supports, that he's a fundamentally good person, but the evidence doesn't support that he did this solely or even primarily out of an altruistic intent to just distribute moneys to the minority community.  And even if he did so, the means themselves were wrongful and deserve punishment.  The crime required forethought and sophistication.  It was unambiguously wrong, and it violated the basic norms to which we expect

N7RHMarS

everyone in society to adhere.

I also need to consider the interest of general deterrence.  A sentence that a court imposes must be calibrated to send a message to others that it is not worth it to engage in criminal behavior; that even if there is a low risk that they will be caught, the consequences of being caught far outweigh the potential of any benefit.  The fact that the sentence has to serve the interest of general deterrence is not based on —— and I don't have any misguided or grandiose notion that my sentence or, indeed, the sentence that any single judge imposes can send a message of general deterrence.  I don't think the sentence that any single judge imposes can send such a message of general deterrence.  It's based upon the notion that there should be some parity across sentences.  That judges have to consider not just the sentence they impose but how the sentence they impose relates to sentences that are imposed by others, and it's animated by the notion that if all or most judges ignore the interest of general deterrence, then a critical function of the criminal law to prevent crime from occurring, and not just to punish it after it occurred, would be undermined.

Now, the law does not tell me the precise sentence that I need to impose to satisfy the parsimony principle.  It's not a mechanical or arithmetic exercise.  And Mr. Schachter's surely right when he says that the question is not in terms of

N7RHMarS

discount.  The question for me is the minimum sentence of incarceration that I must impose in order to satisfy the purposes of sentencing.  I'm well cognizant that I will be taking Mr. Martinez out of the community, and each day that he's out of the community will not only cause a harm to Mr. Martinez but also will cause a harm to the community itself.  And here, I am impressed by the presentation from Mr. Martinez's lawyers, from the letters that I've received, and the presence of all the people here and from Mr. Martinez's comments to me and Mr. Schachter's comments to me.

Mr. Martinez grew up poor, and he built up a stable and successful life for himself and his family.  He's given selflessly to many communities.  Those contributions appear to be genuine.  They were not just made when he knew that he was facing criminal charges.

He has a clean record, and he's never been in trouble with the law before.  He's got a stable network to return to after he serves his time in prison.  He has the skills and record to continue to contribute to society after he returns.  He's done good works in a number of ways, and I'm satisfied that he will continue to do it.

I also credit two things:  First of all, I credit that this crime did occur to some extent at a moment of darkness for Mr. Martinez, and that gives me some confidence that it's not characteristic of him at all.  He's not a young person, and his

N7RHMarS

life up until the time of these extraordinarily serious crimes was, as I've mentioned, a law-abiding one.

I also am taking into account that the sentence that I impose will include a punishment, a forfeiture, and forfeiture is a punishment.  It's not the same as restitution.  He's going to not just account for the harm that he caused, but he's going to have to return every cent of the proceeds that he received.

So those are the factors that I think about.  In thinking about those factors, I've concluded that I must impose a sentence close to the guideline sentence in this case but not quite as serious as the guideline sentence in this case.  I will now state the sentence I intend to impose.  The attorneys will have a final opportunity to make legal objections before the sentence is finally imposed.

Mr. Martinez, would you please rise.

After assessing the particular facts of this case and the factors under Section 3553(a), including the sentencing guidelines, it is the judgment of the Court that you are to serve a sentence of imprisonment of 54 months in the custody of the Bureau of Prisons, to be followed by a period of three years of supervised release.

As to supervised release, you will be subject to the following mandatory conditions set forth at pages 35 to 36 of the presentence report:

You must not commit another federal, state, or local

N7RHMarS

crime.

You must not unlawfully possess a controlled substance.  You must refrain from any unlawful use of a controlled substance and must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter as determined by the Court.

You must cooperate in the collection of DNA as directed by the probation officer and must make restitution in accordance with 18 U.S.C. Sections 2248, 2259, 2264, 2327, 3663, 3663(a), and 3664.

You must comply with the standard conditions of supervised release.  The standard conditions of supervised release as set forth on pages 36 to 37 of the presentence report shall apply.

You must also meet the following special conditions that are set forth in the presentence report, including that you must provide the probation officer with access to any requested financial information and must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

And you will participate in an outpatient treatment program approved by the U.S. Probation Office, which program may include testing to determine whether you've reverted to using drugs or alcohol.

N7RHMarS

The last condition is based upon Mr. Martinez's use of alcohol while on pretrial release.  The first two conditions are based upon the financial nature of the crime and the financial nature of the sentence that I'm imposing.

I'm imposing restitution of 71,711 —— $711,000 —— let me try again.  $71,711,893.  I'm also imposing —— with a consent order of restitution to be submitted in seven days.

I'm also imposing forfeiture of $71,711,893.07 pursuant to the consent order of forfeiture I've been provided.

I'm waiving the fine based upon ability to pay.

And I'm imposing the mandatory special assessment of $100, which shall be due immediately.

You may be seated.

Mr. Fergenson, do you know of any legal reason why the sentence should not be imposed as stated?

MR. FERGENSON:  No, your Honor.  Just one correction to the forfeiture amount.  I believe you gave the same amount as the restitution, and it's actually $44,546,712.94 for forfeiture, your Honor.

THE COURT:  I think I did give the wrong number.  Can you give that to me again, 44 million.

MR. FERGENSON:  Yes, your Honor.  $44,546,712.94.

THE COURT:  OK.  So I revise what I said.  I'm imposing forfeiture of $44,546,712.94.

Mr. Schachter, do you know of any legal reason why the

N7RHMarS

sentence as stated should not be imposed?

MR. SCHACHTER:  No, your Honor.

THE COURT:  OK.  The sentence as stated is imposed.

Are there recommendations that you would like me to make with respect to the sentence?

MR. SCHACHTER:  Yes, your Honor.  We would ask that the Court recommend to the Bureau of Prisons that Mr. Martinez be placed at the camp at Lewisburg, Pennsylvania.

THE COURT:  I will make that recommendation.

Are there open counts?

Mr. Schachter, is there another recommendation?

MR. SCHACHTER:  Yes, your Honor.  We —— actually, it's a request.

THE COURT:  OK.

MR. SCHACHTER:  Normally, we understand that designation is taking about three months.  As the Court saw in our papers, Mr. Martinez's mother turns 90 on December the 24th.  It is —— given the length of incarceration, he may not see her again, and it would be ——

THE COURT:  You're asking for a surrender date to be set in the beginning of next year, is that right?

MR. SCHACHTER:  Yes, your Honor.

THE COURT:  Is there any objection to that from the government?

MR. FERGENSON:  No, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N7RHMarS

THE COURT:  Let me come up with a date, and I'll run it by the parties.

January 13 make sense, Mr. Schachter?

MR. SCHACHTER:  Yes.  Thank you, your Honor.

THE COURT:  All right.  The defendant will surrender for service at the institution designated by the Bureau of Prisons before 2 p.m. on January 13, 2024, or as notified by the probation or Pretrial Services department.

I'm going to ask about bail in a second, but before we get to that, are there open counts?

MR. FERGENSON:  Yes, your Honor.  The government moves to dismiss any open counts.

THE COURT:  That motion is granted.  The open counts are dismissed.

Let me advise Mr. Martinez that to the extent you have not given up your right to appeal your conviction and sentence through your plea of guilty and the agreement that you've entered into with the government in connection with that plea, you have the right to appeal your conviction and sentence.  If you are unable to pay the cost of an appeal, you may apply for leave to appeal *in forma pauperis*.  The notice of appeal must be filed within 14 days of the judgment of conviction.

What are the bail conditions and is there any objection to them continuing as set?

MR. FERGENSON:  No objection to continuing the current

N7RHMarS

conditions, your Honor.

THE COURT:  All right.  Bail will be continued as set.

Is there anything else from the government?

MR. FERGENSON:  No, your Honor.

THE COURT:  Is there anything else from the defense?

MR. SCHACHTER:  No, your Honor.

THE COURT:  I would like to thank the many members of the audience for being here and would also like to acknowledge Mr. Martinez's words to me.  They were helpful in imposing sentence, and it's never an easy thing to impose sentence.

Mr. Martinez, I wish you luck.  And as I said, I am confident that after you serve your time, you will become a valuable member to the community again.

Thank you all.

(Adjourned)